IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BETTY J. GOSDA,<br><br>               Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security;<br><br>               Defendant. | **4:11CV3176**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

## PROCEDURAL BACKGROUND

The Plaintiff, Betty J. Gosda, a/k/a Betty J. Harris-Gosda, filed for disability and SSI benefits on August 20, 2008. (Tr. 151-58.) Gosda alleged that she has been disabled since August 1, 2008. A video administrative hearing was held before Administrative Law Judge ("ALJ") David W. Engel on August 26, 2010. (Tr. 26-64.) On September 20, 2010, the ALJ issued a decision concluding that Gosda is not "disabled" within the meaning of the Act and therefore is not eligible for either disability or SSI benefits. (Tr. 11-20.) The ALJ determined that, although Gosda suffers from severe impairments and is unable to perform her past relevant work, she can perform other jobs classified as "sedentary" work. (Tr. 18-19.) On August 12, 2011, the Appeals Council denied Gosda's request for review. (Tr. 1-4.) Gosda now seeks judicial review

of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Gosda claims that the ALJ's decision is incorrect because the ALJ failed to: (1) incorporate all of the treating physicians' opinions in considering her residual functional capacity ("RFC"); and (2) explain why weight was given to the treating physicians' opinions upon which he relied.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

### I. Documentary Evidence

Gosda was born in 1983 and was 26 years old at the time of her administrative hearing.  (Tr. 155.)  In her disability report, she alleged disability due to a heart condition.  (Tr. 173.)

In January 2008, Gosda complained to her treating physician, Chadd Murray, M.D., of palpitations, lightheadedness, dizziness, and low blood pressure (hypotension).  Her blood pressure was 80/52.  Dr. Murray assessed palpitations and referred her to cardiology for further evaluation.  (Tr. 257.)  The next day, Gosda saw a cardiologist who started her on medication, encouraged her to stop smoking, and recommended Chantix therapy to assist her with smoking cessation.  (Tr. 271-72.)  Gosda returned to Dr. Murray in March of 2008, still complaining of hypotension and dizziness.  Her blood pressure was 82/42.  Dr. Murray instructed Gosda to increase her fluid intake and recommended a change at her job so she was not standing continuously, which he

opined "should make a big difference as well." (Tr. 247.) The next month, Gosda continued to complain of dizziness, low blood pressure, palpitations, and fatigue. Dr. Murray stated that the palpitations were likely secondary to her episodes of low blood pressure. He recommended an electrocardiogram ("EKG") and a follow-up appointment with cardiology. (Tr. 246.)

At her cardiology appointment, Gosda reported head pressure, dizziness, and near fainting that occurred two to three times each day only while she was working. (Tr. 269.) Her blood pressure was 105/68, and she had excellent hydration. (Tr. 269-70.) Her medication was changed and she was "highly encouraged" to stop smoking. (Tr. 270.) An EKG was normal. (Tr. 280.) In May 2008, a loop recorder was implanted to monitor Gosda's palpitations. (Tr. 282.)

In May 2008, Gosda told Dr. Murray that she was still having problems with dizziness. Her blood pressure was 72/42. Dr. Murray stated that her low blood pressure was affecting her dizziness. He released her to return to work for four hours without restrictions, advising that if she could not tolerate four hours she should return. (Tr. 256.) On June 2, 2008, Gosda told Dr. Murray that she had not experienced any palpitations, although she still suffered from fatigue and hypotension. He referred her to her cardiologist. (Tr. 255.) On the same day, Gosda told her cardiologist that she fainted two days earlier and continued to feel light-headed and dizzy when working on the factory line. She had stopped taking her medication because she felt it caused her to be drowsy at work. Her loop recorder showed some sinus rhythm, multiple episodes of artifact, and some bradycardia with inverted P-wave. Gosda denied palpitations and chest discomfort. She was drinking a case of water daily. (Tr. 268.) The cardiologist

3

changed her medication and highly encouraged her to stop smoking, while noting that she did "not seem very well motivated" to do so. (Tr. 267-68.) Four days later, Gosda told Dr. Murray that despite her dizziness and hypotension she was feeling better and wanted to return to work. (Tr. 254.)

At the end of June 2008, Gosda told her cardiologist that she had another dizzy spell at work. She reported that her employer would not allow her to take frequent water breaks, and therefore she was considering changing jobs. Her cardiologist stated she could return to work as long as she continued to drink a lot of water, and he offered to support her effort to quit smoking. (Tr. 266.)

In August 2008, Gosda went to the emergency room with chest pain, shortness of breath, numbness in her extremities, and some visual blurring. She was still smoking. (Tr. 287.) A chest x-ray was normal, as was her sinus rhythm. (Tr. 288.)

In September 2008, Gosda told Dr. Murray that she was still having problems with dizziness, palpitations, and hypotension. He again referred her to a cardiologist. (Tr. 251.)

One week later, cardiologist Ahmed Kutty, M.D., evaluated Gosda. An EKG was normal. Dr. Kutty told Gosda to cut back on caffeine, quit smoking, wear TED (compression) hose, and drink plenty of water. (Tr. 305.) A head-up tilt table test was negative. (Tr. 297-98.) A treadmill stress test showed satisfactory exercise tolerance, but Gosda did not achieve a target heart rate of 167 beats per minute. No angina or equivalent symptoms were noted, although Gosda did experience lightheadedness and dizziness. (Tr. 297.) The test revealed provocable ischemia involving the inferior wall and fixed defect involving the basal half of the anterior wall most consistent with soft

4

tissue attenuation. Ejection fraction was 65 percent and no regional wall motion abnormalities were noted. (Tr. 298.)

On September 24, 2008, Gosda had a selective coronary angiography, left heart catheterization, and right femoral angiography. (Tr. 307.) The tests showed: angiographically normal coronary anatomy; evidence of microvascular angina involving the distal left anterior descending artery distribution; and normal left-sided hemodynamics. The doctor told her to reduce her risk factors by quitting smoking. (Tr. 308.)

In October 2008, Dr. Kutty told her to stop smoking and recommended a 48-hour Holter monitor to evaluate her rhythm. (Tr. 313.) Later that month, Gosda returned to the emergency room because she had a tooth pulled earlier in the day and fainted after getting up too quickly. (Tr. 242, 346.)

In February 2009, Dr. Kutty noted that Gosda's loop recorder showed episodes of atrial flutter up to 150 beats per minute. She continued to have near syncopal episodes. Dr. Kutty told her to quit smoking and adjusted her medications. (Tr. 371.)

In April, Gosda complained to Dr. Kutty of lightheadedness with syncopal and near syncopal episodes during the three months since her last visit. She felt that increasing stress in her family situation was causing her episodes, and overall she reported feeling better. She was told again to use quit smoking, use TED (compression) hose, and increase her fluid intake. Dr. Kutty prescribed Xanax for anxiety. (Tr. 369.)

When she returned in July 2009, she complained to Dr. Kutty of dizzy spells. Her blood pressure was 80/50. She had not fainted since her last visit. (Tr. 364.)

5

In October 2009, she reported doing fairly well despite experiencing a recent increase in fatigue, dizziness, light-headedness, and low blood pressure that day. Her monitor showed several episodes of sinus tachycardia, bordering on atrial tachycardia at 154 per minute. Dr. Kutty adjusted her medications and told Gosda to increase her fluid intake and avoid caffeine and other stimulants. (Tr. 362.) By November, her dizzy spells were less frequent and milder. (Tr. 360.)

In February 2010, Gosda told Dr. Kutty that she had fewer spells and she was getting better. She was taking her medications as prescribed. Her loop recorder was to be removed that week. (Tr. 355.)

In March 2010, Gosda told Dr. Kutty she had fewer episodes, was starting medications, and was willing to work part-time. (Tr. 352.) Dr. Kutty wrote to Vocation Rehabilitation that Gosda could attend school to be a medication aide and she could work part-time. She was to stay well-hydrated and take appropriate breaks throughout the day. He wrote that she could work four-hour days consecutively or greater than eight-hour days with days off in between. A weight-lifting restriction of 30 pounds was advised. (Tr. 354.)

In July 2010, Gosda told Dr. Murray that she had no air conditioning and the heat was causing her to experience chest pain, palpitations, hypotension, and dizziness. Dr. Murray requested cooling assistance. (Tr. 375.) An EKG was normal. (Tr. 374.)

On August 2, 2010, Gosda saw Dr. Kutty and complained of chest pains that she described as resulting from anxiety due to her brother's recent death. He advised her to continue her medications, stay hydrated, and quit smoking. Gosda stated that she was "currently not ready" to quit smoking. (Tr. 350.)

6

On August 18, 2010, Gosda told Dr. Murray that she had almost fainted the night before and felt confused afterwards. Dr. Murray ordered an electroencephalography (EEG) and told Gosda that if she had another fainting episode she should go to the hospital. (Tr. 373.)

In August 2010, Dr. Murray completed a medical source statement. (Tr. 399-402.) He noted that he first saw Gosda in 2003, and he last saw her in August 2010. (Tr. 399.) He stated that Gosda: was absent from work approximately three to four times per month due to her impairments or treatment; could sit, stand, and walk for two hours during an eight-hour work day; could lift and carry up to 25 pounds occasionally; and would need to take unscheduled breaks during the day. (Tr. 400-02.)

Also in August 2010, Dr. Kutty completed a medical source statement. (Tr. 395-98.) He first saw Gosda in May 2005, and last saw her in August 2010. (Tr. 395.) Dr. Kutty stated that Gosda: would need to take unscheduled breaks during the day; had a functional level of Class II (comfortable at rest but have symptoms with ordinary physical activity) and a therapeutic Class B (ordinary activity need not be restricted, but severe activity is not advised); was absent from work approximately three to four times per month due to her impairments or treatment; could sit for two hours and stand and walk for four hours during an eight-hour workday; and could lift and carry 25 pounds occasionally and 10 pounds frequently. (Tr. 396-98.)

In September 2010, Gosda told Dr. Kutty that she had been doing fairly well. Her EKG was normal. (Tr. 422.) A repeat tilt-table study was normal. (Tr. 420.)

In October 2010, Dr. Murray wrote that Gosda had difficulty "holding down any kind of ongoing employment" due to her syncopal episodes and hypotension. He also

7

noted that Gosda suffered from secondary emotional distress with depression and anxiety. (Tr. 428.)

## II.  Administrative Hearing

### A. Plaintiff's Testimony

At her August 26, 2010, administrative hearing Gosda testified that she lived in a house with her husband and six-year-old daughter. (Tr. 34, 40.) She was five feet four inches tall, and she weighed 119 pounds. (Tr. 35.) She smoked about one-half of a package of cigarettes each day. (Tr. 40.) She earned a GED and had taken classes to become a certified nursing assistant and a medication aide assistant. She was able to drive, but she was restricted from driving two weeks before the hearing. (Tr. 36.) She worked full-time until August 2008. (Tr. 41.) At the time of the hearing, her husband was receiving unemployment benefits. (Tr. 43.) She previously worked as a secondary scale operator at a manufacturing plant and as a nurse's aide. (Tr. 38, 43.) At the time of the hearing, she was working between two and four hours daily at the Dew Drop Inn, waiting tables, where she also did food preparation, dishwashing, and cooking. (Tr. 38, 44.) She testified that she could not work more hours than that because of light-headedness, dizziness, and confusion. (Tr. 45.) Gosda reported that she had low blood pressure that caused fatigue and dizziness. (Tr. 47.)

Gosda testified that her blood pressure caused her to become dizzy and lightheaded, slowed her thinking process, and she had to interrupt her daily activities and lie down. She stated that she could not play with her children because quick movements caused her to faint. (Tr. 47.) She gave physical custody of her four-year

8

old son to his father because she was unable to care for both of her children. (Tr. 47-48.)

Gosda's daily activities included doing some household chores, but not vacuuming or laundry. (Tr. 48.) She took two-hour naps every day and "[sat] around a lot." (Tr. 49.) She helped her daughter with homework, and she colored and played board games with her. (Tr. 49.)

Gosda stated that she fainted from low blood pressure about six or seven times and, since approximately 2003, she felt faint about twice weekly. (Tr. 50.) Gosda testified that she could be on her feet for two hours and could sit for two hours before needing to change positions. She could lift 25 pounds occasionally and 10 pounds frequently. (Tr. 53.)

### B. Plaintiff's Husband's Testimony

Gosda's husband, Micah Harris, testified that he lived with Gosda since July 2008. He observed her problems with fatigue, and he stated that Gosda was sleeping between two and four hours during the day. (Tr. 54.) After her two fainting episodes he witnessed, as when he observed her wake from sleeping, he saw that she was unresponsive and groggy. (Tr. 55.) He did most of the housework and chores. (Tr. 56.)

### C. Vocational Expert's Testimony

Bonnie Ward, a vocational expert,[1] testified in response to a hypothetical question posed by the ALJ, outlining Gosda's age, education, work experience, and work-related limitations. (Tr. 56-63.) The hypothetical individual had limitations

---

[1] Ms. Ward's curriculum vitae is in the record. (Tr. 142-43.)

9

identical to those included in Gosda's RFC. (Tr. 59.) Considering the exertional and non-exertional limitations described by the ALJ, the vocational expert testified that the hypothetical person could not perform Gosda's past work but could perform sedentary work as a clerical mailer, order clerk, and semi-conductor assembler. (Tr. 60.)

### III. DISCUSSION

#### A. Standard of Review

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues de novo. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Frederickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004).

#### B. Evaluation of Treating Physicians' Opinions in Determining RFC

Gosda argues that in determining her RFC, the ALJ failed to incorporate all of the opinions of her treating physicians, Dr. Murray and Dr. Kutty, and to give "good reasons" for the weight given to those opinions. Specifically, Gosda argues: Drs. Murray and

Kutty opined that she could only sit for two hours in an eight-hour work day while the ALJ determined that she could sit for six hours; Dr. Kutty stated she could only stand or walk for four hours of an eight-hour work day and Dr. Murray stated she could do the same for two hours, and combined with their recommendations for sitting Gosda would not be able to work full-time; and Drs. Murray and Kutty stated she would be absent from work three or four times monthly, which the vocational expert said would preclude full-time work.

The Eighth Circuit has stated that "Generally, '[a] treating physician's opinion is due *controlling* weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (emphasis added) (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004)). A treating physician's opinion is not "inherently entitled" to controlling weight. *United States v. Hacker*, 459 F.3d 934, 937 (8th Cir. 2006).

The ALJ gave "considerable," not "controlling," weight to the opinions of Drs. Murray and Kutty. The ALJ stated that he evaluated opinion evidence under 20 C.F.R. §§ 404.1527 and 416.927[2] and Social Security Rulings 96-2p[3], 96-5p[4], 96-6p[5] and 06-3p[6]. (Tr. 15.)

---

[2] Sections 404.1527 and 416.927 regard the evaluation of medical opinion evidence.

[3] Social Security Ruling 96-2p regards the policy of giving controlling weight to treating source medical opinions.

[4] Social Security Ruling 96-5p relates to the consideration of medical source opinions on issues reserved to the Commissioner, including the determination of an individual's RFC.

11

Regarding the opinions of Drs. Murray and Kutty, the ALJ stated:

> As for the opinion evidence, *considerable* weight is given to the claimant's treating physician, Dr. Murray and her cardiologist, Dr. Kutty. They both agree that the claimant does have some issues, however; the majority of the testing, most done at Good Samaritan Hospital, has been negative, normal, or mild. Dr. Kutty noted she had no cardiac damage. Both Dr. Kutty and Dr. Murray completed medical source statements and indicated that she could lift up to 25 to 30 pounds, and sit, stand, or walk two hours at one time. Dr. Kutty placed the claimant in Class II functional by the heart association, which is patients who are comfortable at rest but have symptoms with ordinary physical activities and therapeutic, class B, patients whose ordinary activity need not be restricted but who should be advised against severe activity.

(Tr. 18 (emphasis added).)

During his explanation regarding the inconsistencies between Gosda's subjective complaints and the medical evidence, the ALJ stated:

> A letter was written by Dr. Kutty on March 24, 2010, stating that the claimant could work four-hour days consecutively or greater than eight-hour days with days off in between and a lifting restriction of 30 pounds. An MRI of her brain performed due to her headaches, was normal. Her loop recorder was removed. On August 2, 2010, she still had some dizziness and lightheadedness, however; it was better. She had a normal global systolic function of the left ventricle with ejection fraction estimated within normal limits and a mild mitral valve prolapsed per echocardiogram obtained on July 19, 2010. The EKG was normal in July, 2010 and the examination by Dr. Murray was normal in August, 2010.

(Tr. 17 (citations to record omitted).)

In evaluating the medical evidence supplied by treating physicians Drs. Murray and Kutty, the ALJ indicated that not all of their opinions were supported by "medical

---

[5] Social Security Ruling 96-6p regards findings of fact made by state agency medical and psychological consultants. This regulation does not apply to Gosda's case because state agency opinions were not obtained.

[6] Social Security Ruling 06-3p discusses the consideration of opinions and other evidence from sources that are not "acceptable medical sources." This regulation does not apply in Gosda's case because opinions of nonacceptable medical sources were not submitted.

signs and laboratory findings." 20 C.F.R. § 404.1527(c)(3). Overall, the ALJ believed their opinions, together with records regarding testing done at Good Samaritan Hospital, supported his RFC finding. (Tr. 18.)

Specifically, the sitting limitation of two hours per eight-hour work day is not supported by Gosda's testimony that she: sits with her daughter doing homework, coloring or playing board games; would "sit around a lot"; only lies down for two to four hours while she is awake, indicating that she spends the rest of her time sitting or standing; and could sit and stand for two hours before needing to change her position. Also relevant is that while Gosda stated she could not work more than two or four hours at one time in her previous jobs, her past work was all at a medium exertional level and, therefore, that work was more physically demanding than the recommended work at a sedentary level.

The ALJ also supported his decision not to consider the remarks of Drs. Murray and Kutty indicating that Gosda would miss work three or four times monthly, which in the VE's opinion would lead to termination. The ALJ did so by discussing Gosda's medical evidence of record and her daily activities, which indicated essentially normal patterns.

The ALJ also supported his decision by referring to Gosda's failure to quit smoking against her physicians' advice. Her physicians advised her on numerous occasions to quit smoking, and in some instances they noted that she was not motivated to do so. (Tr. 240, 276, 278, 313-14, 318, 350, 353, 355, 360, 362, 364, 369, 371.)

13

Gosda argues that in *Kelley v. Callahan,* 133 F.3d 583 (8th Cir. 1998), the ALJ was "reluctant" to deny benefits solely because the claimant did not quit smoking. In *Kelley*, the ALJ reasoned that the claimant's cardiologist did not state that smoking caused the claimant's problems or that her musculoskeletal complaints would be relieved if she quit smoking. *Id.* at 589. In Gosda's case, however, she alleges disability based on a heart condition. Moreover, Dr. Murray specifically told Gosda to quit smoking due to her pregnancy, heart condition, and for her general health maintenance. (Tr. 276-77.) Also, on one occasion when Gosda told Dr. Kutty she was considering a pregnancy he advised her that her smoking habit would cause a pregnancy to be high-risk. (Tr. 313.) As the Eighth Circuit Court of Appeals stated in *Mouser v. Astrue*, 545 F.3d 634 (8th Cir. 2008), "[t]his is not a case in which the correlation between claimant's smoking and claimant's impairment is not readily apparent." *Id.* at 638 (distinguishing *Kelley*, 133 F.3d at 589).

C. **Hypothetical Posed to Vocational Expert**

Gosda argues that the hypothetical question posed to the VE did not contain all of the opinions of Drs. Murray and Kutty. An ALJ is only required to include in a hypothetical posed to a VE those limitations that are credible and supported by the record. *Meyerpeter v. Astrue*, No. 4:11-CV-00748, 2012 WL 4762410, at *9 (8th Cir. Oct. 5, 2012). For the reasons discussed above, the ALJ did not accept all of the opinions of Drs. Murray and Kutty as credible. The hypothetical properly included those limitations supported by the record.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1. The Commissioner's decision is affirmed;

2. The appeal is denied; and

3. Judgment in favor of the Defendant will be entered in a separate document.

Dated this 13th day of November, 2012.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge